# Exhibit 1

 **CT Corporation**

**Service of Process Transmittal**
11/12/2020
CT Log Number 538579783

**TO:** Patrick Gillham
Fox Corporation (Ny)
2121 AVENUE OF THE STARS FL 9
LOS ANGELES, CA 90067-5010

**RE:** **Process Served in Delaware**

**FOR:** Fox News Network, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | MICHAEL AVENATTI, PLTF. vs. FOX NEWS NETWORK, LLC, ETC., ET AL., DFTS. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # N20C11102MMJ |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/12/2020 at 15:01 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/12/2020, Expected Purge Date: 11/17/2020 |
| | Image SOP |
| | Email Notification,  Patrick Gillham  patrick.gillham@fox.com |
| | Email Notification,  Joy Dumlao  joy.dumlao@fox.com |
| | Email Notification,  Christopher Reed  chris.reed@fox.com |
| **SIGNED:** | The Corporation Trust Company |
| **ADDRESS:** | 1209 N Orange St<br>Wilmington, DE 19801-1120 |
| **For Questions:** | 866-401-8252<br>EastTeam2@wolterskluwer.com |

Page 1 of  1 / RG

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                  Thu, Nov 12, 2020

**Server Name:**           Parcels Inc.


Entity Served             FOX NEWS NETWORK, LLC

Agent Name                THE CORPORATION TRUST COMPANY

Case Number

Jurisdiction              DE



# SEITZ VAN OGTROP & GREEN, P.A.

ATTORNEYS AND COUNSELORS AT LAW

BERNARD A. VAN OGTROP
JAMES S. GREEN, SR.
R. KARL HILL

Writer's Direct Dial: (302) 888-7604
Writer's E-Mail Address: khill@svglaw.com
www.svglaw.com

JAMES S. GREEN, JR.
JARED T. GREEN

November 12, 2020

Via Hand Delivery
Fox News Network, LLC
c/o Corporation Trust Company (registered agent)
1209 Orange Street
Wilmington, DE 19801

### RE:  Michael Avenatti vs. Fox News Network, LLC et al.

Dear Sirs:

Please be advised that hard copy documents and materials, as well as Electronically Stored Information ("ESI"), have been determined to be relevant in this matter and you are being given notice that you are hereby required to preserve all such information as described herein. This preservation notice and the description of potentially relevant information shall in no way constitute the entirety of the information you are obligated to preserve, only a minimum requirement based on our current understanding of your systems and processes, as well as computer systems in general.   These systems may be owned or maintained by you, your employees, third parties or contractors. Any information you deem potentially relevant in addition to any noted herein shall be preserved.

## OBLIGATION TO PRESERVE

Information and electronic data have been deemed relevant or potentially relevant in this matter. *As a result, you have a duty to take all reasonable steps to preserve any and all information, documents, materials, documents, and electronic information potentially relevant to this matter.*

Electronically stored data in particular can easily be altered, deleted or otherwise changed. Your obligation to preserve relevant and potentially relevant ESI includes, but is not limited to:

• Halting any process that destroys data, including but not limited to data destruction procedures (manual or automatic) and backup cycling.

• Preservation of all relevant or potentially relevant hardware.

• Preserve any and all systems used to make data readable or usable including, but not limited to, passwords, encryption schemes, proprietary hardware or databases, or specialized software or hardware needed to render data readable.

## DATA REQUESTED

Preservation of all ESI that is relevant or potentially relevant to this matter is required. This ESI includes, but is not limited to, documents, spreadsheets, user created files, text messages, encrypted messages (i.e. WhatsApp, Signal, Telegram, etc.), instant messages, direct messages, tweets, Facebook messages and postings, email and other communications, schedules and calendars, internet usage data and system files and logs in your possession, the possession of your employees or third parties or contractors.

Electronically Stored Files – You are required to preserve, among other things:

• Active data (data readily available to a user) including, but not limited to:

      — Word processing and text documents
      — Research packets
      — Spreadsheets
      — Calendar or scheduling entries
      — PDF documents
      — Forms
      — Notes and collections of text or other data created or assembled by a user
      — Presentations
      — Graphs and charts
      — Audio or video files
      — Collaborative documents stored locally or otherwise

• Archive data (backups, local or otherwise).

• Deleted data (data deleted by a user or a system process but still recoverable through forensic methods).

• Media used to house active data and media used to house backup data as well as any hardware specifically required to access the media (hard disk drives, tape drives, magneto-optical drives, etc.).

• Cloud/Internet data stored on remote servers, computers or other storage devices not in your immediate control that synchronize with, or are accessible from, one or more devices used by you or members of your organization including any recoverable deleted data available at the time of receipt of this notice.

Email - You are required to preserve all email data relevant to or potentially relevant to this matter in its original electronic format.

Text Messages, Encrypted Messages, Direct Messages, Instant Messages - You are required to preserve all text messages, encrypted messages, direct messages, and instant messages relevant to or potentially relevant to this matter in its original electronic format.

Tweets and Social Media Posts - You are required to preserve all tweets and social media posts relevant to or potentially relevant to this matter in its original electronic format.

Devices and Hardware - You are required to preserve all electronic devices that contain data relevant or potentially relevant to this matter, whether currently in use or not including any and all portable devices (i.e. cell phones or tablets) that contain or may contain relevant or potentially relevant data. No hardware devices containing relevant or potentially relevant data shall be destroyed, disposed of, repurposed or altered in any way that could cause damage or alterations to the electronically stored data contained within them.

Internet Usage Data - You are required to preserve any and all internet usage data stored locally or otherwise including but not limited to browser logs, history data and internet "cookies".

System Files and Logs – You are required to preserve any and all system files and logs generated on or relating to individual computer systems and their usage.

## PRESERVATION REQUIREMENTS

You are required to preserve the above items as they include or pertain to:

• Specific, relevant persons or groups, including, but not limited to: Michael Avenatti, Stephanie Clifford (a/k/a Stormy Daniels), and Julie Swetnick

• Specific, relevant topics or keywords, including, but not limited to: Michael Avenatti, Stephanie Clifford (a/k/a Stormy Daniels), Julie Swetnick, arrest, and domestic violence

• Specific, relevant time frames or dates, including, but not limited to: February 2018 to the present.

## COMPLIANCE

In order to demonstrate compliance with your duty to preserve ESI, you must maintain a log of all alterations or deletions of data made to any ESI location, device or file indicating when the change was made, specifics of the content of the change, the reason for the change and who made the change.

Any and all physical devices, hard drives, cell phones, tablets, computer systems and other sources of ESI that contain relevant or potentially relevant data shall be listed on a chain of

custody document indicating the location of the item, the custodian of the item and any unique identifying information for the item such as a model and serial number.

All electronic data and ESI created after receipt of this letter that qualifies per the content of this letter for preservation shall be preserved in accordance with the steps outlined herein to ensure proper preservation.

Compliance with this preservation request extends to all possible custodians, including employees, anchors, on-air talent, vendors, third parties, contractors and others who may be in possession of relevant or potentially relevant ESI, whether listed in this document or not. You shall forward a copy of this request to any such parties immediately.

Very truly yours,

R. KARL HILL

RKH/cw
Enclosure

EFiled: Nov 12 2020 09:47AM EST
Transaction ID 66103237
Case No. N20C-11-202 MMJ

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,                          :

      Plaintiff,                          :

v.                                         :      C.A. No. _____

                                           :

FOX NEWS NETWORK, LLC,                     :
a Delaware Limited Liability Company;      :
SEAN HANNITY; LAURA INGRAHAM;  :      **JURY TRIAL DEMANDED**
MARIA BARTIROMO;                           :
HOWARD KURTZ; SHANNON BREAM;  :
BRET BAIER; TRISH REGAN;                   :
RAYMOND ARROYO; JON SCOTT; and  :
LELAND VITTERT,                            :

                                           :

      Defendants.                         :

## SUMMONS

**THE STATE OF DELAWARE**
**TO: PARCELS, INC.**
**YOU ARE COMMANDED:**

    To summon the above-named defendant within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon R. KARL HILL, ESQUIRE, plaintiff's attorney, whose address is SEITZ, VAN OGTROP & GREEN, P.A., 222 Delaware Avenue, Wilmington, DE 19899, an answer to the complaint (and, if an affidavit of demand has been filed, an affidavit of defense).

    To serve upon defendant a copy hereof and of the complaint (and of the affidavit of demand if any has been filed by plaintiff). Dated: _____

                        *Chief Deputy Prothonotary*
                        *Lisa M. Gonzalez*

                        _____

                        *Per Deputy*

**TO THE ABOVE-NAMED DEFENDANT:**

    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint (and, if an affidavit of demand has been filed, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the complaint (or in the affidavit of demand, if any).

                        *Chief Deputy Prothonotary*
                        *Lisa M. Gonzalez*

                        _____

                        *Per Deputy*

EFiled: Nov 12 2020 09:47AM
Transaction ID 66103237
Case No. N20C-11-102 MMJ

## SUPERIOR COURT
## CIVIL CASE INFORMATION STATEMENT (CIS)

COUNTY:   N ☒   K ☐   S ☐                    CIVIL ACTION NUMBER:

| | |
|---|---|
| **MICHAEL AVENATTI,**<br>PLAINTIFF,<br><br>v.<br><br>**FOX NEWS NETWORK, LLC, A DELAWARE LIMITED LIABILITY COMPANY, SEAN HANNITY; LAURA INGRAHAM, MARIA BARTIROMO, HOWARD KURTZ, SHANNON BREAM, BRET BAIER, TRISH REGAN, RAYMOND ARROYO, JON SCOTT AND LELAND VITTERT,**<br>DEFENDANTS. | Civil Case Code: CDEF<br>Civil Case Type: Defamation<br>(SEE REVERSE FOR CODE AND TYPE)<br><br>Name and Status of Party Filing Document:<br>PLAINTIFF<br><br>Document Type: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>**COMPLAINT**<br>JURY DEMAND: ☒ YES ☐ No |
| **ATTORNEY NAME(S):**<br>R. KARL HILL<br><br>**ATTORNEY ID(S):**<br>DE 2747<br><br>**FIRM NAME:**<br>SEITZ, VAN OGTROP & GREEN, P.A.<br><br>**ADDRESS:**<br>222 DELAWARE AVENUE, SUITE 1500<br>P. O. BOX 68<br>WILMINGTON, DE 19801<br><br>**TELEPHONE NUMBER:**<br>(302) 888-0600<br>**FAX NUMBER:**<br>(302) 888-0606<br>**E-MAIL ADDRESS:**<br>KHILL@SVGLAW.COM | **IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER, INCLUDING JUDGE'S INITIALS:**<br><br>**EXPLAIN THE RELATIONSHIP(S):**<br>**OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:**<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADINGS PROCESS FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

**EFiled: Nov 12 2020 09:47AM EST**
**Transaction ID 66103237**
**Case No. N20C-11-102 MMJ**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,

    Plaintiff,

v.                                                            **C.A. No.** _____

FOX NEWS NETWORK, LLC,
a Delaware Limited Liability Company;
SEAN HANNITY; LAURA INGRAHAM;     **JURY TRIAL DEMANDED**
MARIA BARTIROMO;
HOWARD KURTZ; SHANNON BREAM;
BRET BAIER; TRISH REGAN;
RAYMOND ARROYO; JON SCOTT; and
LELAND VITTERT,

    Defendants.

## COMPLAINT

Comes now the Plaintiff, Michael Avenatti ("Mr. Avenatti"), by and through his undersigned counsel, for his Complaint and Jury Demand against Defendants Fox News Network, LLC ("Fox News"), Sean Hannity ("Mr. Hannity"), Laura Ingraham ("Ms. Ingraham"), Maria Bartiromo ("Ms. Bartiromo"), Howard Kurtz ("Mr. Kurtz"), Shannon Bream ("Ms. Bream"), Bret Baier ("Mr. Baier"), Trish Regan ("Ms. Regan"), Raymond Arroyo ("Mr. Arroyo"), Jon Scott ("Mr. Scott"), and Leland Vittert ("Mr. Vittert"), to allege as follows:

## NATURE OF THE CASE

1.  This lawsuit results from the purposeful and malicious efforts by Fox News and its leading on-air talent in and about mid-November 2018, and thereafter, to malign and defame Mr. Avenatti, and thus destroy his reputation and livelihood, and eliminate him as an adversary and threat to President Donald J. Trump. As set forth in detail herein, at all relevant times, Fox News

operated as a de facto media and propaganda arm of the Trump White House and Trump campaign, with its anchors and executives keenly aware of the threat Mr. Avenatti posed to the Trump Administration and the President's re-election effort. Indeed, in the months and days leading up to the actions by the Defendants described below, Mr. Avenatti was widely seen by many of the President's closest advisors, including those at Fox News such as Defendant Sean Hannity, as Trump's fiercest critic, most vocal antagonist and the most significant obstacle to the President's re-election. On September 28, 2018, shortly before the Defendants undertook their efforts to destroy Mr. Avenatti's reputation as alleged herein, Mr. Steve Bannon, a frequent Fox News guest, former Trump White House Chief Strategist and the leading architect and campaign strategist for Trump's successful election campaign in 2016, stated on HBO in response to the question "Who scares you?" as it related to Trump's re-election effort in 2020 that it was "Avenatti," because "he's got a fearlessness, and he's a fighter . . . I think he'll go through a lot of this field . . . like a scythe through grass . . . I don't think a professional politician is going to be there at the end of the day, I've always said it's going to be someone like Oprah or an Avenatti . . . someone that's more media savvy." Mr. Bannon further added that "If Bernie Sanders had an ounce of Avenatti's fearlessness, he would have been the Democratic nominee [in 2016] and we would have had a much tougher time beating him." Importantly, Mr. Bannon has been routinely touted by Fox News and its on-air talent, including Defendant Hannity and Tucker Carlson, including as recently as September 17, 2020, as one of the most insightful and knowledgeable Republican presidential campaign strategists in modern times.

2.     Less than two months later, Fox News and the individual Defendants, operating as smear merchants, succeeded in eliminating Mr. Avenatti as a threat, "cancelling" him, and destroying his reputation by, among other things, repeatedly and maliciously engaging in

defamation *per se* and falsely Mr. Avenatti of (a) having been charged with felony domestic violence, (b) having been charged with assault, (c) committing the crime of domestic violence and assault against a woman, resulting in charges, (d) leaving a woman with a bruised face and a black eye; (e) yelling "She hit me first!" at the time of his arrest, and (f) engaging in acts of moral turpitude, and then broadcasting all of those known lies to millions of people. Defendants repeatedly ignored the most basic journalist standards because they wanted to advance their well-known and easily documented animus and biased agenda against Mr. Avenatti and destroy his reputation, especially among women. Defendants' actions were undertaken with actual malice and were nothing short of a blatant, purposeful smear campaign that repeatedly demonstrated an outrageous, conscious and reckless disregard for the truth and the rights of Mr. Avenatti, warranting compensatory and punitive damages in an amount in excess of $250 million.

3.      Purposely false and reckless speech has no value in society nor is it protected under the Constitution or the law. There is no First Amendment right to lie and fabricate as part of a malicious effort to destroy a man's life and reputation.

## THE PARTIES

4.      Plaintiff Michael Avenatti is an individual.

5.      Defendant Fox News Network, LLC ("Fox News") is a Delaware limited liability company with its registered agent located on Orange Street in Wilmington, Delaware. Fox News takes the citizenship of its member(s). Fox News has a sole member - Fox Television Stations, LLC, also a Delaware limited liability company. At all relevant times, Fox News operated and controlled the Fox News Channel, Fox Business and www.foxnews.com.

6. Defendant Sean Hannity ("Mr. Hannity") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of his employment with Fox News.

7. Defendant Laura Ingraham ("Ms. Ingraham") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of her employment with Fox News.

8. Defendant Maria Bartiromo ("Ms. Bartiromo") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of her employment with Fox News.

9. Defendant Howard Kurtz ("Mr. Kurtz") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of his employment with Fox News.

10. Defendant Shannon Bream ("Ms. Bream") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of her employment with Fox News.

11. Defendant Bret Baier ("Mr. Baier") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of his employment with Fox News

12. Defendant Trish Regan ("Ms. Regan") routinely appeared, at all relevant times, on television as on-air talent for Fox News and, upon information and belief, was an employee of Fox

4

News who undertook each of the actions set forth herein in the course and scope of her employment with Fox News.

13.     Defendant Raymond Arroyo (Mr. Arroyo") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of his employment with Fox News.

14.     Defendant Jon Scott ("Mr. Scott") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of his employment with Fox News.

15.     Defendant Leland Vittert ("Mr. Vittert") routinely appears on television as on-air talent for Fox News and, upon information and belief, is an employee of Fox News who undertook each of the actions set forth herein in the course and scope of his employment with Fox News.

## JURISDICTION AND VENUE

16.     Jurisdiction and venue before this Court are proper because Defendant Fox News Network, LLC is a resident of the State of Delaware with its registered agent located in Wilmington, Delaware, conducts business in this State and within New Castle County, and is subject to the statutes and common law of this Court; each of the remaining Defendants were, on information and belief, at all relevant times employees, agents and/or affiliates of Defendant Fox News Network, LLC, had substantial and continuing contacts with the State of Delaware, and undertook all of the actions and conduct herein alleged in the course and scope of their employment with Fox News; and a substantial part of the events or omissions giving rise to this action occurred within the State of Delaware and the City of Wilmington.

5

17.     Moreover, on information and belief, at all relevant times, all Defendants transacted and conducted business within the State of Delaware; derived substantial revenue from services used and business within the State of Delaware; expected or should have expected their acts to have consequences within the State of Delaware; and purposely availed themselves of the privilege of conducting activities and business within the State of Delaware, thus invoking the benefits and protections of its laws.

## FACTUAL ALLEGATIONS

18.     Paragraphs 1 through 17 above are incorporated herein by reference.

### A. Mr. Avenatti

19.     Mr. Avenatti graduated from high school in St. Louis, Missouri in 1989 and later became the first person in his family to graduate college, earning a Bachelor of Arts degree from the University of Pennsylvania. He subsequently attended George Washington University Law School, where he was a member of the law review and graduated *order of the coif*, first in his class. Mr. Avenatti obtained both his undergraduate degree and his law degree by putting himself through school after his father was unexpectantly downsized in 1989 by a large corporation where he had worked for over 31 years.

20.     In 2000, after passing the bar exam on his first attempt, Mr. Avenatti became a licensed attorney.

21.     In 2007, Mr. Avenatti was recognized out of thousands of attorneys in his state as one of the top 20 attorneys under the age of 40.

22.     In 2008, Mr. Avenatti obtained a $41 million jury verdict for three clients in New Brunswick, New Jersey who had been defrauded out of their life's work.

23.     In 2009, Mr. Avenatti was voted by his peers as the Trial Lawyer of the Year.

6

24.     In 2010, George Washington University Law School honored Mr. Avenatti with its prestigious "Recent Alumni Achievement Award." Prior to this honor, the law school had placed Mr. Avenatti on its Board of Advisors and had also named an annual award to a graduating student after Mr. Avenatti – the "Michael J. Avenatti Award for Excellence in Pre-Trial and Trial Advocacy."

25.     In 2011, Mr. Avenatti settled a malicious prosecution case on behalf of two individual clients for $39,000,000, an amount believed to be one of the largest results ever obtained in such a case nationwide.

26.     In the middle of a jury trial in 2014, Mr. Avenatti settled a class action he had brought against a publicly traded company on behalf of Jewish families whose loved ones' remains had been removed from plots in a cemetery and dumped in a mass grave, all in the name of profits. Tragically, many of those remains belonged to individuals who had managed to survive the Holocaust and who had been freed from Nazi concentrations camps at the end of the Second World War. After extensive work in the case, Mr. Avenatti procured a settlement for his clients valued at approximately $85 Million. The case was featured on *60 Minutes* in 2012 in a story titled "Final Resting Place."

27.     In April 2017, Mr. Avenatti obtained a $454 million jury verdict in Federal District Court on behalf of doctors, nurses and first responders after they were sold fraudulent and defective personal protective equipment during the Ebola pandemic by one of the largest publicly traded companies in the world. As a result of the verdict, defective personal protective equipment (PPE) was removed from the United States National Stockpile in 2017, ensuring the safety of hundreds of thousands healthcare workers in the future (i.e. during the current COVID19 pandemic). That case was also featured on *60 Minutes* ("Strike-Through") and subsequently led to Mr. Avenatti

7

being awarded the national Public Justice Trial Lawyer of the Year Award, an annual award given to the attorney(s) who made the greatest public contribution to the public interest within the preceding year by trying or settling a precedent setting, socially significant case.

28.     In sum, between June 2000 and February 2018, when he first met Stephanie Clifford (a/k/a Stormy Daniels), Mr. Avenatti obtained over $1 Billion in verdicts and settlements for his clients as lead counsel, including numerous verdicts and settlements in excess of $10,000,000. He had successfully represented clients before various courts and juries throughout the United States and received extensive local and national press coverage for his work. Most importantly, he had accomplished significant change for the greater good.

29.     Indeed, at all relevant times, Mr. Avenatti was a real trial attorney, with real clients and real successes and was not, despite the later repeated bogus claims of Defendant Fox News, some "TV lawyer" or "porn lawyer" who was "drunk on his first fifteen minutes of fame."

**B. The Feud with President Trump**

30.     In approximately 2006, Mr. Trump engaged in a sexual liaison with Ms. Daniels, an adult film actress. He was married at the time, with a four-month-old son at home.

31.     On June 16, 2015, Mr. Trump announced his candidacy for President of the United States; he officially became the Republican Party nominee on July 19, 2016.

32.     On or about October 7, 2016 - a month before the general election - the *Washington Post* published online a video and accompanying audio in which Mr. Trump referred to women in vulgar terms in a 2005 conversation with Billy Bush, the host of *Access Hollywood*.

33.     Mr. Trump knew that in the wake of the *Access Hollywood* scandal, the Stormy Daniels story would further threaten his chances in the general election. Over the course of the next three weeks, Trump's personal attorney and "fixer," Michael Cohen, orchestrated a settlement

8

that contained a non-disclosure agreement ("NDA"), pursuant to which Cohen made a $130,000 payment to Daniels for the purpose of securing her ongoing silence with respect to her affair with President Trump.

34.     On or about January 12, 2018, the *Wall Street Journal* first reported that Cohen had arranged the hush payment to Ms. Daniels. Ms. Daniels subsequently hired Mr. Avenatti in February 2018 to represent her against President Trump, and he quickly became Trump's chief antagonist in the civil legal arena and in the court of public opinion.

35.     In early 2018, Mr. Avenatti filed two lawsuits against President Trump on behalf of Ms. Daniels. First, on March 6, 2018, he filed an action against Trump in California state court seeking to have the NDA declared unenforceable. That action was ultimately removed to the United States District Court for the Central District of California. *See Clifford v. Trump, et al.*, No. 18-cv-2217-SJP (C.D. CA). President Trump resisted efforts by Mr. Avenatti to take his deposition, and then ultimately was forced to abandon his efforts to enforce the NDA against Ms. Daniels, resulting in Ms. Daniels winning the case against him. Second, Mr. Avenatti filed an action for defamation against Trump in response to a tweet by Trump that claimed Daniels was a liar. *See Clifford v. Trump*, No. 18-cv-6893-SJO (C.D. CA) (transferred from SDNY). That action was dismissed because the district court found that Trump's tweet was protected by the First Amendment. *Id.* An appeal of the dismissal was later filed before the Ninth Circuit Court of Appeals.

36.     Through the exercise of Ms. Daniels' First Amendment right of access to the courts and his own First Amendment right to speak truth to power, these lawsuits gave Mr. Avenatti a platform to expose, for the public's benefit, President Trump's misconduct, corruption and mendacity. Mr. Avenatti developed and executed an extensive media strategy, and he was

interviewed on television hundreds of times about the legal proceedings and President Trump. He subsequently became the President's fiercest, most vocal critic and, according to many, the foil for President Trump by beating him at his own game. He also became a significant, widely recognized threat to Trump's presidency and re-election chances.

37.    According to author Michael Wolff in his 2019 *New York Times* bestselling book *Siege: Trump Under Fire*, President Trump became obsessed with Mr. Avenatti, and "could not get enough" of him. Trump marveled at Mr. Avenatti's media savvy and ability to control a news cycle. He would consistently refer to Mr. Avenatti as "a killer," a complimentary term that had been used by Trump's father to describe those he highly respected. President Trump routinely called Mr. Avenatti "a star" and became convinced that he needed people to be tough like Avenatti, "get up there with Avenatti" and go after him.

38.    Although Cohen later admitted to making the hush-money payment, President Trump lied to the American public when he denied knowing about it.

39.    On August 21, 2018, Cohen pleaded guilty to an Information charging him with, among other crimes, felony campaign finance violations related to the payment to Daniels. *See United States v. Cohen*, 18-cr-602-WHP (S.D.N.Y.) Cohen admitted under oath that he committed the campaign finance violations "in coordination with, and at the direction of" President Trump. Phone records corroborate Cohen's public statements that Trump directed Cohen to pay the $130,000 to Daniels as part of an effort to silence her.

40.    Other records demonstrate that individuals close to the President, including his son, Donald, Jr., and his close advisor, Hope Hicks, actively participated in the conspiracy, either through the payment to Daniels, the reimbursements of Cohen and/or the cover-up of the crimes.

10

Curiously, however, none of the other participants have been indicted, and the investigation appears to be closed without any justification.

### C. Mr. Avenatti's Potential Candidacy

41. In approximately July 2018, after consulting with senior and influential members and political consultants of the Democratic and Republican parties, Mr. Avenatti publicly announced his intention to consider a 2020 candidacy for the White House and began travelling the country to raise money for down-ballot Democratic candidates.

42. As part of those efforts, in August 2018, Mr. Avenatti spoke at the annual Wing Ding Dinner in Iowa, an event widely known for its prominence among leading Democrats seeking the presidency. Mr. Avenatti's appearance resulted in extremely positive media coverage of his potential candidacy, including in *The Guardian*, *New York Times*, *Des Moines Register*, and on CNN and NBC News. For instance, on August 11, 2018, *The Guardian* reported that "Michael Avenatti could become the second person to go from cable news fixture to President. Speaking to a crowd of activists at the Iowa Democratic Wing Ding event, Avenatti left the room electrified. The lawyer, who is exploring a potential presidential bid, turned what has been a sleepy presidential pre-season so far upside down. The lawyer for Stormy Daniels has become a national sensation . . . While Democratic activists like Avenatti on television, they love[d] his live show Friday. They clapped and cheered and flocked to him for selfies afterwards in a mob scene. Jeff Link, a top Democratic operative in the state, who was spending the day accompanying Avenatti, said the only comparison he had ever witnessed was Barack Obama's first visit to the state in 2006 . . . Avenatti drew repeated standing ovations as he called for a vigorous, aggressive Democratic response to Trump . . . [A] former Obama and Sanders supporter said, "I haven't been this excited since JFK." The *New York Times* stated that Mr. Avenatti had received "a thunderous ovation at

11

the end of his speech, notably louder than the applause for the nights' other speakers . . ." NBC News reported the thoughts of an Iowa caucus goer, "Ordinarily, a Joe Biden-type of person would've been my candidate, but what [Avenatti] said tonight was exactly what I thought before I came . . . We do need a fighter and he could stand up to Trump." This press coverage was followed by similar stories after Mr. Avenatti attended events in South Carolina, Florida, Ohio, New Hampshire, Nevada, California, and elsewhere.

43.     During the Fall of 2018, Mr. Avenatti was routinely referred to as the most significant Democratic threat to President Trump and his continued presidency by the media and political analysts on the left *and the right.* For example, on September 28, Mr. Steve Bannon told Bill Maher on *Real Time with Bill Maher* that Mr. Avenatti was the biggest threat to Mr. Trump's re-election effort in 2020. Mr. Bannon, a frequent Fox News guest, has been repeatedly trumpeted by Fox News and Tucker Carlson, including as recently as September 17, 2020, as a leading presidential election strategist. Mr. Bannon, former Trump White House Chief Strategist and the leading architect and campaign strategist for Trump's successful election campaign in 2016, stated in response to the question "Who scares you?" as it related to Trump's re-election effort in 2020 that it was "Avenatti," because "he's got a fearlessness, and he's a fighter . . . I think he'll go through a lot of this field . . . like a scythe through grass . . . I don't think a professional politician is going to be there at the end of the day, I've always said it's going to be someone like Oprah or an Avenatti . . . someone that's more media savvy." Mr. Bannon further added that "If Bernie Sanders had an ounce of Avenatti's fearlessness, he would have been the Democratic nominee [in 2016] and we would have had a much tougher time beating him." Conservative pundit Ben Shapiro and other Republican analysts likewise predicted that Mr. Avenatti would win the Democratic nomination were he to run and could displace Mr. Trump from office.

44.     Not surprisingly, President Trump did not take kindly to Mr. Avenatti's continued advocacy for Ms. Daniels, his consistent exercise of his constitutional rights in calling out Trump's corruption, or Mr. Avenatti's potential candidacy for 2020. Trump told those around him that he was concerned that he was being "outplayed" in the media by Mr. Avenatti and that Mr. Avenatti "is not your average weak democrat", "he's a brawler who is really good on TV", "he could go toe to toe with me in debates", and "be really tough." In further response, he attacked Mr. Avenatti publicly during rallies (referring to Mr. Avenatti as "Aviante"), in press statements and using social media.

45.     In addition to the personal attacks from President Trump, Trump's surrogates, close advisors and family members likewise engaged in a near constant effort to silence and smear Mr. Avenatti, including though the use of a juvenile moniker – "The Creepy Porn Lawyer" – and the spreading of false information about Mr. Avenatti by way of social media and "leaks" to the press. These attempts included near constant personal attacks by the President's son, Donald Trump Jr., the same individual at the center of the Michael Cohen case who inexplicably remains unindicted, and a close personal friend of certain of the Defendants, including Defendant Hannity.

46.     On information and belief, President Trump contacted various friends and political advisors in the Fall of 2018 by telephone and asked whether they believed Mr. Avenatti could beat him in a head to head matchup for the presidency in 2020.

47.     On October 13, 2018, Mr. Avenatti authored an op-ed in the *New York Times* titled "The Case for Indicting the President" in which Mr. Avenatti argued for the immediate indictment of President Trump as a result of his criminal involvement in the hush-money scandal.

48.     On October 30, 2018, *Politico* reported in an article titled "These are the Six Democrats Leading the 2020 Media Primary," that Mr. Avenatti was one of the top democrats

13

dominating the discussion regarding 2020. *Politico* added that Mr. Avenatti had been mentioned in over *70,000* print and online news stories *in the prior three months alone*, and had appeared in more social media posts during those three months *than any other perspective Democratic candidate for President,* including former Vice President Joe Biden, Senator Kamala Harris, Senator Bernie Sanders, and Senator Elizabeth Warren.

49.     As of November 14, 2018, Mr. Avenatti had not formally declared himself to be a candidate for President.

### D. Defendant Fox News

50.     Fox News is a multi-billion-dollar organization that has been the most watched cable news network in America for over a decade. It is also the most watched cable network on television and routinely outperforms the three major American networks (ABC, CBS and NBC) for ratings, with many of its shows drawing millions of viewers every hour, especially in primetime. For instance, Defendant Hannity's show *Hannity* averages over 4,000,000 viewers each night. Indeed, millions of viewers tune-in to Fox News each day for facts and information, and over *60 million* people watch Fox News every month. The network is regularly regarded as the most powerful and influential news organization in the United States, if not the World. Its profits routinely exceed $2 Billion each year.

51.     At all relevant times, Fox News was a traditional media source and was not akin to a chat room or blog found on the Internet. In addition, Fox News maintained a "standards department" that controlled the content of its programming, as well as the statements of fact Fox News and its on-air talent reported and broadcast.

52.     In the months and years leading up to the conduct alleged herein, Fox News and certain of the Defendants routinely claimed that it was and is the most reliable news source in

14

America. For instance, on February 5, 2010, the founder of Fox News, Roger Ailes, declared that Fox News was premised on the core principle "We report, you decide. Fair and balanced." Thereafter, Fox News repeatedly used this statement to describe its network and reporting to tens of millions of people. In addition, Fox News and certain of the Defendants routinely claimed during all relevant times that Fox News and their reporting was the "Most Trusted, Most Watched" on television. Moreover, Fox News and certain of the Defendants repeatedly stated to their viewers during all relevant times that Fox News is "Real News." Further, at all relevant times, the most influential owner of Defendant Fox News, Rupert Murdoch, publicly described it as "the most important media outlet in America."

53.     Beginning no later than early 2017 and continuing up through November 2018, Fox News and the Defendants routinely and publicly mocked and derided other news networks and print publications as reporting "fake news," being part of the "fake news establishment," and as unreliable sources for facts and information as to breaking stories and news events. In other words, Fox News and Defendants purposely created and fostered the perception and belief among tens of millions of Americans that if they wanted to know "the truth" and the "real facts" relating to an event or an individual, Fox News was the *only* network and news source that could be relied on to provide true and accurate reporting of the truth and the facts. As detailed herein, this was patently false.

54.     At all relevant times, Defendant Fox News served as a de facto media arm of the Trump campaign and Administration and engaged in propaganda to benefit President Trump and his re-election efforts. This conduct included, but was not limited to, Defendant Fox News and the individual Defendants purposely deceiving their viewers and the American public by (a) stating things as fact that Fox News knew not to be true; (b) concealing facts damaging to President Trump

15

that Fox News knew to be true; (c) targeting enemies and adversaries of President Trump through the broadcast of knowingly false and defamatory information and "facts;" and (d) utilizing a constant and consistent bias geared toward protecting Trump when reporting events involving and/or impacting the President.

55.     At all relevant times, Fox News and the Individual Defendants, including but not limited to Defendants Hannity, Ingraham and Bartiromo, as well as Fox News employee Lou Dobbs, maintained close, improper personal relationships with (a) President Trump; (b) members of his family, including Donald Trump Jr. and Eric Trump; (c) Trump's closest political advisors; and (d) high ranking officials and officers of the Republican National Committee (collectively, the "Trump Parties"). These relationships included the exchange of text messages, instant messages, direct messages, emails and/or phone calls relating to the issues and individuals impacting President Trump and his presidency.

56.     At all relevant times, Defendant Hannity was referred to within Defendant Fox News as President Trump's "Shadow Chief of Staff" and "consigliere," titles Hannity proudly fostered and perpetuated. The patently improper relationship between Trump and Defendant Hannity included regular phone calls both before and after Defendant Hannity's Fox News show, during which Trump would recommend talking points and themes, and specify individuals and enemies that Trump wanted Defendants Hannity and Fox News to target. This improper relationship extended to Defendant Hannity appearing at various Trump related political events, including on-stage with Trump at a "MAGA" political rally in Missouri on November 5, 2018 (only days before the defamation directed at Mr. Avenatti as alleged in detail herein), during which Defendant Hannity stated: "By the way, all those people in the back are fake news."

16

57.     In 2017, Defendants Fox News and Hannity were caught maliciously reporting fabricated statements and "facts" relating to the death of Mr. Seth Rich, a 27-year-old Democratic National Committee staffer. After evidence surfaced in May 2017 that Defendants Fox News and Hannity had purposely peddled a knowingly false and unfounded conspiracy theory regarding the tragic murder of Mr. Rich, including by falsely claiming they were relying on information obtained from the Washington, D.C. police department, Fox News and Hannity were forced to retract their defamatory statements and admit their duplicitous conduct. For instance, Defendant Fox News admitted on May 23, 2017, "On May 16, a story was posted on Fox News website on the investigation into the 2016 murder of DNC Staffer Seth Rich. **The article was not initially subjected to the *high degree of editorial scrutiny we require for all of our reporting.* Upon appropriate review, the article was found not to meet those standards and has since been removed. We will continue to investigate their story and will provide updates as warranted" (emphasis added). Accordingly, Defendants Fox News, Hannity and the other Defendants were on notice no later than May 23, 2017 that before information was reported and broadcast as "fact," the information had to be verified as accurate and was required to be subjected to a high degree of editorial scrutiny. Further, Defendants at all relevant times knew the basic rule taught to all journalists and reporters long before they enter the news business and broadcast to millions of people: "If your mother tells you she loves you, check it out." However, as set forth in detail below, when it came to reporting on Mr. Avenatti, Defendants deliberately and recklessly discarded and ignored their own "standards" and all semblance of journalist norms.

58.     On March 20, 2018, Mr. Ralph Peters, a retired Lieutenant Colonel from the United States Army and a then Fox News employee with ten years of experience at the network, wrote a scathing memorandum to management and co-workers at Fox News describing the network as a

17

"propaganda machine for a destructive and ethically ruinous administration." Mr. Peters later added that his former colleagues, including certain of the individual Defendants, were "prostitutes" and that "Fox isn't immoral, it's amoral . . . Trump was a gift to Fox and Fox in turn is a gift to Trump."

59.    On information and belief, during the period March 2018 through November 2018, and continuing thereafter, Defendants communicated with the Trump Parties about Mr. Avenatti and his client Ms. Daniels on a regular basis. These communications included, but were not limited to, discussions as to Mr. Avenatti being a threat to the presidency of Trump and his 2020 re-election effort.

60.    In the Spring of 2018, after concluding that Mr. Avenatti was a considerable threat to the Trump presidency and Trump's re-election efforts, Fox News, together with one or more of the Trump Parties, created the juvenile moniker the "Creepy Porn Lawyer" (a/k/a "CPL") as part of its effort to maliciously smear, demean, undermine and defame Mr. Avenatti and do substantial damage to his reputation. Fox News and certain of the Defendants proceeded to repeatedly and publicly use and broadcast this derogatory term as part of their personal animus directed at Mr. Avenatti and to describe and identify Mr. Avenatti on hundreds of occasions on the Fox News Network from the Spring of 2018 up through and including November 14 and 15, 2018 and beyond. Notably, Fox News made it a point to consistently target Mr. Avenatti with this moniker on its primetime shows, including on *Tucker Carlson Tonight*, one of the highest rated shows on cable television, which reaches approximately five million viewers per night.

61.    On September 29, 2018 - the day after Mr. Bannon's appearance on Bill Maher as detailed above - Mr. Avenatti was in New Hampshire attending various Democratic Party events as part of his potential candidacy. That evening, Defendant Fox News began contacting friends

and associates of Mr. Avenatti's, stating that they were seeking comment about a national story they were getting ready to break regarding a sexual assault committed by Mr. Avenatti. Defendant Fox News claimed to have a credible victim - a young man in Seattle, Washington who was alleging that years prior, he had been sexually assaulted in a bathroom at a house party in Seattle, Washington by Mr. Avenatti. Defendant Fox News further claimed that the house belonged to a specific friend of Mr. Avenatti's. Defendant Fox News' blatant attempt to malign Mr. Avenatti's reputation, however, was quickly thwarted when it was shown by Mr. Avenatti and others that Mr. Avenatti had never been to a house party in Seattle, let alone the house allegedly at issue, had never met or interacted with the "victim," and was not even in Seattle when the alleged assault occurred. Approximately one week later, Fox News called one of Mr. Avenatti's friends, mistakenly thinking they were instead calling the "victim" they had fabricated and conspired with. During that call, Defendant Fox News made highly incriminating statements and admissions evidencing their bogus attempt to destroy Mr. Avenatti with a fabricated and totally false sexual assault story.

62.     On November 3, 2018, Defendant Fox News referred to Mr. Avenatti in primetime as "Michael Avenatti a/k/a The Ambulance Chasing A-Hole."

**E. Jacob and David Wohl**

63.     At all relevant times, Mr. Jacob Wohl ("Jacob") and his father, Mr. David Wohl, resided in the Los Angeles/Southern California area and were vocal supporters of President Trump who repeatedly claimed to have a close personal relationship with the President and his advisors. Mr. David Wohl was a regular guest on Fox News and also served, according to him, as a 2016 campaign surrogate for then candidate Donald Trump.

64.     At all relevant times, Jacob, approximately 20 years old in 2018, was a smear merchant and social media troll, widely known for spreading pro-Trump conspiracy theories. Despite this, prior to November 2018, President Trump and his advisors on occasion re-tweeted various social media postings of Jacob and his father in an effort to further disseminate false information and advance the political efforts of President Trump.

65.     Beginning in October 2018, Jacob launched a smear campaign designed to destroy the reputation and credibility of Mr. Robert S. Mueller, III, the former head of the FBI and the then Special Counsel of the United States Department of Justice investigating Trump and Russian interference in the 2016 election. In particular, Jacob attempted to frame Mr. Mueller by offering to pay multiple women tens of thousands of dollars to lie and accuse Mr. Mueller of rape and sexual assault, including through the use of false affidavits signed under penalty of perjury. At least two of the women had never even met Mr. Mueller. Jacob had hoped that once the women came forward and complained, a criminal investigation would result, and Mr. Mueller would be arrested and/or eliminated as a threat to President Trump.

66.     Shortly after learning of Jacob's claims and attempt to frame Mr. Mueller, Mr. Mueller referred Jacob to the FBI for investigation and possible criminal prosecution. On October 31, 2018, Fox News published an article written by Fox News reporter Brooke Singman titled: "Special Counsel Notifies FBI of Alleged Scheme to Pay Women for False Allegations against Mueller."

67.     On or about November 1, 2018, approximately two weeks before Mr. Avenatti's arrest described below, Jacob held a press conference during which he accused Mr. Mueller of rape and sexual assault. Jacob told the assembled press that investigative experts at a company named Surefire Intelligence had uncovered Mr. Mueller's assault and abuse of women, and that

20

his "client," a woman named Carolyne Cass, was credibly accusing Mr. Mueller of raping her in New York City during the week of August 2, 2010 at the St. Regis Hotel. Jacob further stated that he had conclusive, detailed evidence of the rape and that he and his "client" were in the process of reporting the sexual assault to law enforcement. Jacob then proceeded to describe "facts" to the press relating to the assault in excruciating detail. Jacob later caused these claims to be published online on the alt-right news site *The Gateway Pundit* with a headline that read "Believe All Women."

68.     Within days, Jacob's claim that Mr. Mueller had committed sexual assault had been completely debunked, shown to be fabricated and widely reported as fraudulent and a hoax. Surefire Intelligence was discovered to be a front for Jacob, a "company" with no employees that was operated out of his mother's home and used her phone number. Ms. Cass admitted that she had never met Mr. Mueller and that Jacob had fabricated the entire claim, offering her $50,000 to go along with his attempt to frame Mueller and have Mueller falsely arrested for sexual assault.

69.     As of November 7, 2018, at the very latest, Fox News and certain of the Defendants were fully aware of the generally dubious and radioactive nature of any claim made by Jacob, as well as the need to be extremely cautious when reporting any story involving Jacob and/or any story involving an arrest for which Jacob claimed responsibility. This was even more true when it came to reporting on any arrest or "facts" relating to an alleged assault of a woman supposedly perpetrated by an adversary or threat to President Trump. Indeed, Jacob had publicly admitted to planning ways to discredit Democrats seeking the presidency in 2020 with lies, disinformation and fabricated stories using his large following on social media.

70.     Approximately 15 months later, in February 2020, Jacob and David Wohl were positioned in the first row at one of President Trump's political rallies in Manchester, New

21

Hampshire. When Trump entered the event, he made it a point to walk over to Jacob and David Wohl and enthusiastically acknowledge them.

71.     On October 1, 2020, Jacob was charged with four felony counts in the State of Michigan relating to his efforts to intimidate minority voters and scare them into not voting in the November election, thereby assisting President Trump's reelection chances. He faces over 20 years in prison as a result for his conduct in Michigan. He was later also charged with multiple felonies in Ohio. On information and belief, Jacob is facing additional potential felony charges in New York and Pennsylvania for similar conduct.

72.     On October 28, 2020, the Hon. Victor Marrero, United States District Court Judge, found that Jacob had purposely engaged in illegal efforts to attempt to influence the 2020 presidential election and re-elect Donald Trump: "Today, almost 150 years later, the forces and conflicts that animated Congress's adoption of the Ku Klux Klan Act as well as subsequent voting rights legislation, are playing out again before this Court, though with a difference. In the current version of events, the means [Jacob uses] to intimidate voters, though born of fear and similarly powered by hate, are not guns, torches, burning crosses, and other dire methods perpetrated under the cover of white hoods. Rather, [Jacob carries] out electoral terror using telephones, computers, and modern technology adapted to serve the same deleterious ends. Because of the vastly greater population they can reach instantly with false and dreadful information, contemporary means . . . may be more detrimental to free elections than the approaches taken for that purpose in the past eras . . . The First Amendment cannot confer on anyone a license to inflict purposeful harm on democratic society or offer refuge for wrongdoers seeking to undermine bedrock constitutional principles. Nor can it serve as a weapon they wield to bring about our democracy's self-destruction."

22

**F. Mr. Avenatti's Arrest and Defendants' Defamatory Statements**

73.     In the late morning/early afternoon of November 14, 2018, Mr. Avenatti was arrested by the Los Angeles Police Department. At the time of this arrest, Mr. Avenatti was 48 years old and had never been previously arrested in his life for any reason, even as a juvenile. He had never been charged with any crime and he had no criminal record. Further, he had no history of domestic violence or assault against anyone, let alone a woman.

74.     Almost immediately after Mr. Avenatti was arrested, Jacob Wohl, the same individual who had attempted to frame Mr. Mueller for rape and sexual assault only two weeks earlier using fabricated evidence, a bogus victim, and a sham company (Surefire Intelligence), posted a message on Twitter from the Surefire account regarding Mr. Avenatti. The message referenced Mr. Avenatti's arrest and specifically stated "Surefire Intelligence strikes again," suggesting that Wohl and his associates were responsible for Mr. Avenatti's false arrest and had attempted to frame him in a manner similar to Mr. Mueller.

75.     Shortly after Mr. Avenatti's arrest and before Mr. Avenatti was released, Fox News and Defendants also learned of Jacob Wohl's tweet, and further learned from officials at the Los Angeles Police Department and others that Mr. Avenatti had been arrested but had not been charged with any crime. They also learned that (a) Mr. Avenatti's estranged wife was not involved in any domestic related incident involving Mr. Avenatti, was not a complaining witness or victim, and had not filed any felony domestic violence report; (b) there were not any bruises on the face of any witness, victim or woman in connection with any incident involving Mr. Avenatti; (c) there was not any witness, victim or woman with a black eye in connection with any incident involving Mr. Avenatti; and (d) there was no instance of Mr. Avenatti stating or yelling to anyone "She hit me first!" in connection with any incident involving Mr. Avenatti.

23

76.     Further, Fox News and Defendants also became aware that Mr. Avenatti's first wife of 13 years, Christine, whom he had known since 1992 and had two minor daughters with, and his estranged second wife of seven years, Lisa, whom he had known since 2000 and had a young son with, had both publicly stated that afternoon that Mr. Avenatti had never assaulted them and that he had never exhibited any violence directed towards a woman. In particular, they knew Lisa had publicly stated: "I haven't seen Michael in months. It's a complete fabrication. Bruises on my face? It is insanity. He wouldn't hit anybody. Especially a woman. He's got two daughters."

77.     Mr. Avenatti was quickly released from custody. Critically, he was not charged with domestic violence, assault or any other crime that day or the next day (November 15, 2018), let alone a felony resulting from violence directed at a woman. Further, Mr. Avenatti has **NEVER** been charged with any crime relating to his arrest and both the Los Angeles District Attorney and the Los Angeles City Attorney have made clear that no charges (felony or misdemeanor) will result.

78.     At all relevant times, Fox News and the other Defendants knew and understood there was a marked, material difference – factually, legally, reputationally and culturally - between someone being *arrested* on suspicion of having committed a crime and someone actually being *charged* with a crime. They also knew and understood that the latter was and is far more serious than the former.

79.     Despite Defendants' knowledge as to the circumstances of Mr. Avenatti's arrest, including Jacob Wohl's claimed involvement and tweet, and the information learned from the Los Angeles Police Department, Mr. Avenatti's first and second wives, and others (i.e. that Mr. Avenatti had not been charged with any crime), Defendants nonetheless subsequently proceeded on November 14 and 15, and on the days that followed, to engage in an urgent, purposeful,

24

deliberate, malicious, and reckless effort to destroy Mr. Avenatti's reputation, defame him, soil him in the eyes of the American public and millions of women in particular, paint him as an abuser of women, and eliminate him as a threat to President Trump and a 2020 presidential candidate. They did so with a level of excitement that can only be described as *sheer giddiness*. At its core, this conduct was anchored by a reckless, callous, conscious and outrageous disregard for the truth and was nothing short of a disgusting smear campaign designed to destroy a man's life and livelihood.

80.     On information and belief, both before and after the statements and broadcasts described below, Defendants engaged in various communications with certain of the Trump Parties and others relating to Mr. Avenatti's arrest, and what they intended to report, were reporting, and had reported.

81.     On November 14, 2018, Fox News and Defendant Baier stated and broadcast on the Fox News program *Special Report*, "This is a Fox News Alert . . . [Mr. Avenatti] has been arrested on a domestic violence charge." They did so after "hitting the gong", an internal term at Fox for an audible sound and a "FOX NEWS ALERT", complete with a blazing red graphic that was designed to alert viewers to "breaking news". Defendants further stated that "Michael Avenatti was arrested today after his estranged wife filed a felony domestic violence report." Defendants continued that "her face was swollen and bruised." These statements were broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

82.     Later that night, Fox News and Defendant Hannity stated and broadcast on the Fox News program *Hannity*, "Now we learn tonight that Michael Avenatti has been arrested...He has

25

been charged with [a] serious charge, that would be felony domestic violence." This statement was made while a graphic appeared at the bottom of the screen with the Fox News logo along with the word "ALERT" in yellow against a red background. Defendants later added, "Michael Avenatti, serious charges tonight . . . Let not your heart be troubled, we're always fair, balanced . . .". At the end of *Hannity*, Defendants went to a "Fox News Alert" during which they further described and discussed the "serious charges" they claimed Mr. Avenatti had been charged with. These statements were broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

83.      Following *Hannity*, Fox News and Defendant Ingraham immediately stated and broadcast on the Fox News program *The Angle*, "Hannity, thanks so much. Fantastic show as always tonight." Defendants continued, "And lawyer to the porn stars, you heard Hannity talking about him. Michael Avenatti in some legal trouble of his own." They later added that Mr. Avenatti had been "booked for hitting a woman." Defendants also added a scrolling statement at the bottom of the screen that read, in part, "LOS ANGELES POLICE SAID WED AVENATTI HAD BEEN CHARGED WITH FELONY DOMESTIC VIOLENCE . . . AVENATTI, ALSO A TRUMP CRITIC, HAS CONSIDERED RUNNING FOR PRESDIENT AS A DEM IN 2020." Fox News and Defendant Arroyo then stated, "Now the victim's face is reportedly bruised and swollen. At the time of the arrest, Avenatti said: 'She hit me first, this is bull____.' Fill in the blank. Now that's one substance I think Avenatti has a lot of familiarity with. Your reaction to Avenatti's arrest here on these charges?" These statements were broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

26

84.     Later that same night (November 14), Fox News and Defendant Bream stated and broadcast on the Fox News program *Fox News @ Night*, "Alright, this is a Fox News Alert. One of President Trump's most vocal critics, Michael Avenatti, has been arrested on domestic violence charges." Defendants made this statement while a statement at the bottom of the screen read, in part, "LAPD CONFIRMS". Defendant Bream then brought in Fox News correspondent and Defendant Vittert by announcing, "Correspondent Leland Vittert is tracking *the facts* on this as they come in. Hi Leland" (emphasis added). Defendant Leland proceeded to then falsely state that Mr. Avenatti had been booked by police on "felony domestic violence" while the graphic at the bottom of the screen continued to read, in part, "LAPD CONFIRMS". Later in the segment, Defendant Fox News placed a graphic at the bottom of the screen that read, in part, "AVENATTI ARRESTED IN L.A.; CHARGED WITH ASSAULT" with the Fox News logo appearing underneath it along with the word "ALERT" in yellow against a red background. Defendants Fox News and Leland added that Mr. Avenatti was a 2020 presidential contender. These statements were broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

85.     On the morning of November 15, 2018, Fox News and Defendant Jon Scott stated and broadcast on the Fox News program *America's Newsroom*: "Michael Avenatti charged with domestic violence." This statement was made while a statement at the bottom of the screen falsely stated, "AVENATTI DENIES DOMESTIC VIOLENCE CHARGE". Correspondent Jonathan Hunt then proceeded to state that Mr. Avenatti had "left court last night", even though Defendants knew that Mr. Avenatti had not appeared in any court in connection with the arrest for any reason. When Defendant Fox News later caused the segment to be published and re-published, including

27

within the last year, they did so with the headline "Avenatti out on bail after domestic violence charge." These statements were published and broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

86.     That same morning - November 15, 2018 - Fox News and Defendant Bartiromo stated and broadcast on the Fox program *Mornings with Maria*, "Michael Avenatti out on a bail this morning. . . She was all bruised, black eye." This statement was made while a statement at the bottom of the screen falsely stated, "AVENATTI FACES FELONY". Defendant Bartiromo then brought in "James," one of her Fox News colleagues, who falsely stated: "This is the police report on the injuries to the woman involved here. Right." Another colleague then added, "We have to either way assume that his potential bid for 2020 is off, I say that at the very least." "James" then suggested that the Los Angeles "D.A.'s office" had charged Mr. Avenatti, while the same graphic continued to appear at the bottom of the screen. Defendant Bartiromo next stated that Mr. Avenatti was "running after" a woman before his arrest and "saying 'she hit me first'." Defendant Bartiromo then falsely stated, "Her face is all bruised", while the same graphic appeared. These statements were broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

87.     On the afternoon of November 15, Defendant Fox News stated and broadcast another segment relating to Mr. Avenatti on the Fox News program *The Five*. During the segment, a statement at the bottom of the screen falsely read, "AVENATTI ARRESTED ON DOMESTIC VIOLENCE CHARGE." This statement was broadcast throughout the world, including in

Delaware and the City of Wilmington. Defendant knew this statement was false when it was made and yet Defendant made it maliciously, for the reasons described above.

88.     On November 15, 2018, Fox News published an article on their website about Mr. Avenatti and stated "Avenatti, a frequent President Trump critic and the attorney for adult film star Stormy Daniels, made bail after his arrest on domestic violence charges...". This followed another article published by Defendant Fox News the previous day that also falsely stated that Mr. Avenatti had been charged, as well as various "facts" relating to the alleged incident consistent with Fox News' other defamatory statements. These articles were published and disseminated for access via the Internet, including in Delaware and the City of Wilmington. At the time of this Complaint, various versions of the articles are still accessible from within Delaware. It bears repeating that at the time these articles were published, Fox News was fully aware that their statements in the articles were false. Despite this knowledge, Fox News nonetheless proceeded to publish the articles with malice.

89.     That same day, following the lead of Defendants, Mr. Scott Parker of the Republican National Committee (the "RNC") began publicly circulating a letter in which the RNC claimed that Mr. Avenatti was among the top Democratic presidential candidates and had been "charged with felony domestic violence." As set forth herein, the RNC claim relating to Mr. Avenatti being charged, just like the similar claims by Defendants, was an outrageous lie.

90.     On the night of November 15, 2018, Fox News and Defendant Ingraham stated and broadcast on the Fox News program *The Angle* that Avenatti had been "arrest[ed] last night by the LAPD on domestic abuse charges." Defendants then added that "Avenatti was an arrest waiting to happen...I have a question; can you advocate for women's rights behind bars? I guess they do have those desks set up in prison. How will democrats and liberal women who embraced this

29

would be Trump slayer react now to this?" Fox News and Defendant Ingraham later stated, "He has a heck of a right hook." These statements were broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew these statements to be false when they were made. And yet Defendants made them maliciously, for the reasons described above.

91.     Six days after Mr. Avenatti's arrest, on November 20, Defendants Fox News and Regan falsely stated and broadcast on the Fox News Network show *Trish Regan Primetime* that Mr. Avenatti had been arrested on "felony domestic violence charges last week." Joe Concha, a contributor to Fox News, then proceeded to state on the show that Mr. Avenatti had "felony charges against him," while deriding and criticizing other news networks as "shameful" for not reporting the charges (which, as referenced above, did not exist). Defendant Regan agreed with Mr. Conca's statements, responding "Yeah." Importantly, at no time did Defendant Regan or Fox News correct their false statements nor did they correct Mr. Conca. But they did broadcast them. Defendant Regan, overcome with excitement, then sarcastically asked, while laughing, "What's this mean for his presidential aspirations?" Defendant Regan and Fox News engaged in this conduct despite knowing since the afternoon of November 14 that their statements were false, and that Mr. Avenatti had not been arrested "on felony domestic violence charges" and did not have any charges pending against him. These false statements were broadcast throughout the world, including in Delaware and the City of Wilmington.

92.     Notably, in March 2020, Defendant Regan and Fox News falsely stated on Fox News Network that the coronavirus was "another attempt to impeach the President," while a graphic on screen read "CORONAVIRUS IMPEACHMENT SCAM." This was shortly after Defendant Hannity stated to his millions of viewers that same night that the Coronavirus and media

"hysteria" was "[S]caring the living hell out of people – I see it, again, as like, let's bludgeon Trump with this new *hoax*." (emphasis added).

93.    To compound matters, in the days following November 14, 2018, Fox News and certain of its anchors and on-air talent had the audacity to consistently and publicly mock various other news networks, on air, for not reporting on Mr. Avenatti's "criminal charges." They did so even though they knew that Mr. Avenatti had not been charged with anything and there were no "criminal charges."

94.    On the day following Mr. Avenatti's arrest, November 15, President Trump was asked by a reporter standing on the White House lawn for comment regarding Mr. Avenatti's arrest "on domestic violence charges." On information and belief, this question was posed by a Fox News reporter. Barely able to contain his excitement, President Trump gleefully responded, with a big grin, "No, I wish him the best of luck. I wish him the best of luck."

95.    On November 29, 2018, two weeks <u>after</u> Mr. Avenatti's arrest, Defendants Fox News and Kurtz falsely stated and broadcast on the Fox show *America's Newsroom*, "Let me say with my customary understatement, this has not been a good month for Avenatti, who had fantasies of running for President. He was arrested on charges he disputes of domestic abuse ...". This statement was broadcast throughout the world, including in Delaware and the City of Wilmington. Defendants knew this statement to be false when it was made. And yet Defendants made it maliciously, for the reasons described above. Mr. Kurtz's lie is particularly outrageous seeing as he consistently holds himself out to Fox News viewers as the resident "expert" on the media and their obligation to accurately report the truth and facts.

96.    On December 4, 2018, his reputation destroyed in large part due to the actions of Defendants as described herein and with numerous previous supporters, including many women,

31

having abandoned him, Mr. Avenatti announced that he would not seek the Democratic nomination for President in 2020. Defendants' defamatory smear campaign and their efforts aimed at destroying Mr. Avenatti's reputation and protecting President Trump, as opposed to reporting and broadcasting the truth and actual facts, had succeeded.

97.     On March 25, 20**20**, with the COVID-19 pandemic gripping the nation and millions of Americans at risk, President Trump nonetheless took the time to gloat yet again by sending a tweet referencing Mr. Avenatti's prior "presidential aspirations."

98.     On information and belief, from November 14, 2018 through March 24, 2019, Fox News and various of its anchors and reporters purposely made, published and broadcast other false, defamatory statements, graphics and "facts" about Mr. Avenatti, his "charges" (which did not exist), and the circumstances of Mr. Avenatti's arrest on November 14. Plaintiff will seek to amend this complaint to include those statements, graphics and "facts" once Plaintiff conducts further discovery.

99.     The duplicity, actual malice and recklessness of Defendants' conduct is further exemplified by the fact that on the evening of November 14, Fox News briefly reported the circumstances of Mr. Avenatti's arrest accurately, namely that Mr. Avenatti had been arrested *but not charged*. They then abandoned this reporting in favor of the fabricated and far more damaging false version of the "facts" they used in subsequent broadcasts as detailed above. This further demonstrates that Defendants had knowledge of the falsity of the statements and graphics described in paragraphs 81-88, 90-91, and 95 above at the time they were made and yet deliberately chose instead to broadcast false information about Mr. Avenatti and defame him.

100.    The duplicity, actual malice and recklessness of Defendants' conduct is further evidenced by the fact that Defendants never retracted or corrected any of their prior defamatory

32

statements, did not subsequently broadcast or report that Mr. Avenatti was never charged or that any of their prior statements were untrue and incorrect, and most certainly did not broadcast or report those facts to the same extent as their prior lies and smears about Mr. Avenatti.

101.    On information and belief, the defamatory statements and graphics about Mr. Avenatti described above in paragraphs 81-88, 90-91, and 95 were collectively seen by far more than 10 million people in America and across the world, including tens of thousands of people in Delaware and thousands of people in Wilmington.

102.    Defendant Fox News caused the defamatory statements and graphics described above in paragraphs 81-88, 90-91, and 95 to be re-published and re-broadcast on multiple occasions between the date they were first broadcast and the date of this Complaint, including but not limited to within the last year.

103.    Each of the statements made by the individual Defendants as alleged in paragraphs 81-88, 90-91, and 95 above were made in the course of their employment and/or affiliation with Defendant Fox News and were ratified, further broadcast, and further published by Defendant Fox News.

104.    On information and belief, at all relevant times, each of the Defendants herein was an agent, servant, employee, co-conspirator, partner, and joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

105.    Each of the statements, including the graphics, described above in paragraphs 81-88, 90-91, and 95 were false at the time they were made and broadcast. Mr. Avenatti was not charged on November 14 or on any other day with any crime relating to any alleged incident involving domestic violence or assault. Mr. Avenatti was never arrested "on domestic violence

charges." Mr. Avenatti's estranged wife was not involved in any incident with Mr. Avenatti on November 13 or 14, nor was she a complaining witness or victim, nor had she filed a felony domestic violence report or complaint. There was no incident or allegation involving any bruises on the face of any witness, victim or woman. There was no incident or allegation involving any witness, victim or woman being left with a black eye. And there was never any instance of Mr. Avenatti running after a woman and stating or yelling "She hit me first!". All of this was fabricated and repeatedly broadcast by the Defendants as part of their agenda and efforts to destroy Mr. Avenatti.

106.    Each of the above statements, including the graphics, described in paragraphs 81-88, 90-91, and 95 above were made by Defendants with actual malice and with full knowledge of their falsity at the time they were made. As described herein, Defendants and their agents and employees had information from the Los Angeles Police Department, Mr. Avenatti's first and second wives, and others demonstrating that the statements were false before Defendants made them and yet they purposely proceeded to fabricate, publish and disseminate the false statements as "facts" to millions of people. They did so with actual malice. And they engaged in this abhorrent conduct for the reasons described herein, including their well-established animus toward Mr. Avenatti, desire to curry favor with President Trump, protect him from his biggest antagonist and most visible 2020 threat, and destroy Mr. Avenatti's reputation and 2020 candidacy.

107.    Each of the above statements, including the graphics, described in paragraphs 81-88, 90-91, and 95 were made by Defendants recklessly, with a reckless and conscious disregard for the truth, as Defendants had knowledge that the statements were false at the time they were made and/or disregarded substantial information, facts and reporting showing the statements were false, including but not limited to information in their possession obtained from the Los Angeles

34

Police Department, Mr. Avenatti's first and second wives, and other legitimate news outlets such as the *Los Angeles Times*, CNN, MSNBC and others, as well as the message posted to Twitter by Jacob Wohl.

108. Each of the above statements, including the graphics, described in paragraphs 81-88, 90-91, and 95 were made by Defendants recklessly, with a reckless and conscious disregard for the truth, as Defendants had a high degree of awareness of probable falsity of the statements and also had a high degree of awareness of serious doubt that the statements were true in that Defendants had substantial information, facts and reporting showing the statements were untrue and/or highly unlikely to be true, including but not limited to information in their possession obtained from the Los Angeles Police Department, Mr. Avenatti's first and second wives, and other legitimate news outlets such as the *Los Angeles Times*, CNN, MSNBC and others, as well as the message posted to Twitter by Jacob Wohl.

109. Further, Defendants recklessly, consciously and purposely failed to conduct even the most basic research, inquiry, reporting and investigation prior to making, repeating and broadcasting the false and defamatory statements, including the graphics, described in paragraphs 81-88, 90-91, and 95 above. At all relevant times, Defendants had no interest in the truth surrounding Mr. Avenatti's arrest, rather their sole focus was on eliminating Mr. Avenatti as a threat to President Trump and destroying his reputation.

110. Each of the above statements, including the graphics, described in paragraphs 81-88, 90-91, and 95 were and are defamatory and were and are defamatory *per se*. Among other things, the statements impute a crime to Mr. Avenatti, accuse him of something incompatible with the exercise of his profession or office, and accuse him of having engaged in acts of moral turpitude.

35

111.   Each of the above statements, including the graphics, described in paragraphs 81-88, 90-91, and 95 were and are defamatory because they so harmed the reputation of Mr. Avenatti as to lower him in the estimation of the community and/or deterred third persons from associating or dealing with him.

### G. Defendants' Damning Admissions

112.   In the months prior to and following the Defendants' outrageous conduct aimed at Mr. Avenatti, certain of the Defendants made a number of extremely damaging admissions, further demonstrating their guilt and that their conduct aimed at Plaintiff was undertaken with actual malice and blatant recklessness.  By way of example only, on or about April 24, 2017, Fox News and Defendant Hannity stated on the Fox News program *Hannity*, when reporting that certain media outlets were claiming that Hannity had harassed Fox News guest Debbie Schlussel, that those outlets were trying to "smear, slander and besmirch" Hannity and "destroy [his] reputation." They continued:  "**[I]n light of recent events, I have come to the conclusion I can no longer stay silent. . . . So from now on, if there is any person, any group, any organization, any media outlet that slanders, lies about me, besmirches me, my character, I'm going to be calling them out because at this point, enough is enough . . . I have retained a team of some of the finest and toughest lawyers in the country who are now in the process of laying out the legal course of action we will be taking . . . I will no longer allow slander and lies about me to go unchallenged . . . I will fight every single lie about me by any and all legal means available to me as an American.**"

113.   On April 27, 2018, Fox News and Defendant Kurtz stated on Fox News, when reporting on the media's recent coverage of the relationship between Michael Cohen and Defendant Hannity, "**How can professional commentators go on the air without a shred of**

36

evidence and speculate right after this happened . . . when there is absolutely no evidence to support [it]? . . . You can't make stuff up and speculate."

114. On January 21, 2019, Fox News and its employee Tucker Carlson stated on the Fox News program *Tucker Carlson Tonight*, when reporting on how the media had covered an incident that had occurred approximately 72 hours earlier involving high school student Nicholas Sandmann, **"But did the video really describe what happened? That should have been the first question that journalists asked. Checking facts and adding context is what journalists are paid to do, it's in the first line of the job description.** And yet amazingly, almost nobody in the American media did that, and that's a shame because there was a lot to check." Defendant Fox News and Mr. Carlson made these admissions while a graphic appeared in the upper right of the screen that that read, "*RUSH* TO JUDGMENT", while another graphic appeared at the bottom of the screen that read, "COVINGTON STUDENTS SMEARED BY MEDIA."

115. Yet more damning admissions occurred on February 20, 2019. Defendant Fox News and certain of its employees, including Greg Gutfeld and Jesse Watters, stated on the Fox News program *The Five*, when reporting on a $250 million defamation lawsuit filed by Mr. Sandmann against *The Washington Post*: (a) "Can't say I blame him, because the story isn't about Covington but those that covered it. Not to mention all the money they made off that smear. This case . . . needs to be a journalism course."; (b) "yeah, the media made tons off Covington, so why shouldn't the kid get a piece of the action"; and (c) "I also don't think it matters whether they win this lawsuit. This is just a big blow to fake news, because right now, every newsroom and all the executives, this is coming from the top down, they're telling the editors and the reporters, 'Do not shoot first and ask questions later. It's better to be late and right, than first and wrong.' Because right now, they're facing ruinous lawsuits and it takes the penalty of a financial hit

for them to change their behavior.  Because they're not policing themselves . . . So, the only thing to do is hold them to account financially.  And I like watching the media being held to account because they like to hold other people to account . . . and they never ever have to look inwards, so this is a good thing."

116.    Further admissions by Defendant Fox News occurred on or about March 11, 2019 on *The Five*, when Defendant Fox News and certain of its employees, including Greg Gutfeld, stated, when reporting on a new $275 million defamation lawsuit filed by Mr. Sandmann against CNN:  (a) "The money amounts are meant to send a message to media organizations, like 'your journalists shouldn't be belching bile . . . when they don't even know it's true.' "; (b) "Are people over there so irretrievably stupid that they don't know to take a breath ..."; (c) reporters must "sit back and think about what you are doing, because it's going to happen to you."; (d) defamation constitutes "divisive efforts to cancel people out" and is "ruining people's lives" and "blacklisting people".

117.    On March 13, 2019, senior Fox News employee Shepard Smith stated publicly, **"Being accurate and honest and thorough and fair is our primary mission.  It's our professional calling . . . We must never manipulate or invent.  We must never knowingly deceive.  Because to do so is a disservice to our audience and potentially injurious to our society."**

118.    On May 1, 2019, Defendant Fox News made additional admissions on the Fox News program *The Story with Martha MacCallum* when Defendant Fox News and certain of its employees, including Martha MacCallum and Jesse Watters, stated, while reporting on a new $275 million defamation lawsuit brought against NBC by Mr. Sandmann:  **"[T]he only way you are going way you're going to be able to get them to change their behavior – hit them in the**

38

pocket book! **Because they don't have any integrity, they don't have any shame, and they're**
**not going to self-police or self-correct. So, you have to send a financial chill down their**
**corporate spine.**"

119.   December 11, 2019 brought even more damning admissions by Defendant Fox
News when they aired a segment titled "Media Silent on the Lies They Spread" on *Tucker Carlson*
*Tonight*.  During the segment, Defendant Fox News and their employee Tucker Carlson stated,
when reporting on "Media Dishonesty" (a graphic that repeatedly appeared on screen): "**[I]t's**
**also a big problem for the American news media. They were exposed as liars and no nothings**
**. . . But here's the key, [the reporter] has not apologized or even acknowledged his role in**
**repeating falsehoods . . . his motives remain shrouded in darkness . . . Total dishonest**
**behavior . . . Did he issue a correction, of course he didn't . . . Everything you just saw turned**
**out to be false, if not outright lying, there's no debate about it, we know now, it was wrong .**
**. . Has CNN retracted it or apologized?  That's a rhetorical question.  Apologies require**
**introspection, decency, integrity even.**"

120.   Yet more admissions were made on or about January 14, 2020.  On *Tucker Carlson*
*Tonight*, Fox News and its employee Tucker Carlson claimed that CNN had engaged in a "**rush**
**to judgment**" and was "**destroying lives**" when it reported on Nicholas Sandmann.  "**[They] got**
**busted and they paid, hopefully millions.  They tried to destroy his life.  I hope he crushes**
**them.  I mean it.**"  Fox News and employee Tammy Bruce added, "**Absolutely.  And lawyers**
**suing is not necessarily my favorite thing but the fact is this is one way to keep the powerful**
**in line and especially media when they've not only abandoned their job and responsibility,**
**they've turned themselves into the mob, into a mob of wolves, and are willing to rip anyone**
**apart.  That's going to have to stop.**"

121. On March 11, 2020, Fox News and Defendant Hannity admitted: **"In serious situations, truth matters."**

122. The admissions continued on or about July 24, 2020 on *Tucker Carlson Tonight* when Defendant Fox News and its employee Tucker Carlson stated the following when reporting on Mr. Sandmann's just-settled defamation lawsuit brought against the *Washington Post*: **"Every single day these people [the media] bully Americans, yell at them, berate them, attack them, force them from their jobs. The country's cowering in silence thanks to people like this. But occasionally someone fights back. And even more occasionally, someone fights back and wins . . . Shouldn't news organizations be careful before training a bazooka on people . . ."**

123. Defendants Fox News and Mr. Hannity made additional damaging admissions on August 25, 2020, when they stated the following in primetime: **"We're going to hear from Nicholas Sandmann, remember him? He's going to be a very rich man after taking on all those liars in the media . . . Media mob, you did that to an innocent person."** Defendants Fox News and Hannity then proceeded to trumpet the fact that CNN and the *Washington Post* had to pay settlements to Mr. Sandmann, while noting that NBC News was "next." Defendant Fox News and its employee Brit Hume later added that Mr. Sandmann had been **"brutally crucified by the news media"** and **"good for him."**

124. Further admissions were made by Defendant Fox News and its employees, including Defendant Bret Baier and Jesse Watters, on August 26, 2020 on *The Five*, when they applauded Mr. Sandmann for refusing to be "cancelled" and standing up for his right to be free from defamation: "Bret, [Sandmann] had a nice line when he said 'The full media war machine revved up and didn't try to ask me my side of the story, **wasn't interested in the facts at all.**' **It was a real shot at just journalism in general.**" Defendant Baier stated, **"It's an amazing story.**

40

He's getting the last laugh. I love the fact that he wants to be a lawyer and practice defamation law. And he can buy a lot of MAGA hats with that settlement!"

125. On information and belief, each of the statements described in paragraphs 112-124 above were made by Fox News and individuals in the course and scope of their employment with Fox News, were ratified, affirmed and/or broadcast by Fox News, and constitute admissions admissible against Fox News and others in this lawsuit.

H. Damages

126. As a result of the actions and defamatory statements and graphics by Defendants as alleged herein, Mr. Avenatti suffered ridicule, significant damage to his life and reputation, and substantial monetary damages in the millions of dollars, all in an amount to be proven at trial.

127. However, because each of the defamatory statements in paragraphs 81-88, 90-91, and 95 above are defamatory *per se*, damages are presumed, and Mr. Avenatti is not *required* under the law to plead or prove special damages.

128. Defendants' conduct and defamatory statements and graphics as alleged herein were outrageous and due to an evil motive and/or a reckless indifference to the truth and the rights of Mr. Avenatti, making an award of exemplary/punitive damages appropriate and justified.

129. In engaging in the conduct described herein and in making the defamatory statements and graphics detailed above, Defendants demonstrated a purposeful and conscious disregard and indifference to the foreseeable effects of their actions on Mr. Avenatti, making an award of exemplary or punitive damages appropriate and justified.

### CAUSES OF ACTION

### COUNT ONE – Defamation (Libel/Slander)
### Against All Defendants

130. Paragraphs 1 through 129 above are incorporated herein by reference.

41

131.    As described above in paragraphs 81-88, 90-91, and 95, Defendants made defamatory statements, orally and by way of graphics and print.

132.    Each of the statements described above in paragraphs 81-88, 90-91, and 95 made orally and by way of graphics and print were about the Plaintiff Mr. Avenatti.

133.    Each of the statements described above in paragraphs 81-88, 90-91, and 95 made orally and by way of graphics and print were published and/or broadcast.

134.    A third party would understand the character of each of those communications as defamatory.

135.    Each of the statements described above in paragraphs 81-88, 90-91, and 95 made orally and by way of graphics and print is false.

136.    The Defendants made each of the defamatory statements described above in paragraphs 81-88, 90-91, and 95, orally and by way of graphics and print, with actual malice.

## PRAYER FOR RELIEF

**WHEREFORE** for all of the reasons set forth herein, Plaintiff Michael Avenatti respectfully requests that, following a jury trial on the merits, this Court enter judgment in his favor and against Defendants Fox News Network, LLC; Sean Hannity; Laura Ingraham; Maria Bartiromo; Howard Kurtz; Shannon Bream; Bret Baier; Trish Regan; Raymond Arroyo; Jon Scott and Leland Vittert as follows:

1.  Award compensatory damages to Mr. Avenatti against each and every Defendant for the defamatory statements, graphics and conduct as alleged herein, in an amount in excess of $50 Million, with the exact amount to be proven and/or awarded at trial;

42

2. Award exemplary/punitive damages to Mr. Avenatti against each and every Defendant as a result of their outrageous defamatory statements, graphics, and conduct as alleged herein, and their reckless and purposeful indifference to the truth, Mr. Avenatti's rights and the foreseeable effects of their actions on Mr. Avenatti, in an amount in excess of $200 Million, with the exact amount to be proven and/or awarded at trial;

3. Award Mr. Avenatti his costs and reasonable attorney's fees; and

4. Award Mr. Avenatti all such additional relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that all issues presented by his above Complaint be tried by a jury, with the exception of those that, by law, must be tried before the Court.

SEITZ, VAN OGTROP & GREEN, P.A.

/s/ R. Karl Hill
R. KARL HILL (2747)
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
302-888-7604

and

SHAWN PEREZ (pro hac to be filed)
Law Offices of Shawn R. Perez
7121 West Craig Road, #113-38
Las Vegas, NV 89129
702-485-3977

Attorneys for Plaintiff

Date: November 12, 2020

EFiled: Nov 12 2020 09:47AM
Transaction ID 66103237
Case No. N20C-11-102 MMJ

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,

    Plaintiff,

v.

FOX NEWS NETWORK, LLC,
a Delaware Limited Liability Company;
SEAN HANNITY; LAURA INGRAHAM;
MARIA BARTIROMO;
HOWARD KURTZ; SHANNON BREAM;
BRET BAIER; TRISH REGAN;
RAYMOND ARROYO; JON SCOTT; and
LELAND VITTERT,

    Defendants,

C.A. No._____

**JURY TRIAL DEMANDED**

### MOTION FOR APPOINTMENT OF A SPECIAL PROCESS SERVER

Plaintiff by his attorney, R. Karl Hill, hereby makes application to the Court for the appointment

of Parcels, Inc., a Delaware corporation engaged in the business of serving process, as special process

server for the service of the Summons and Complaint in the above captioned case upon Defendant Fox

News Network, LLC.

                      SEITZ, VAN OGTROP & GREEN, P.A.

                      /s/ R. Karl Hill
                      R. KARL HILL (2747)
                      222 Delaware Avenue, Suite 1500
                      Wilmington, DE 19801
                      (302) 888-0600

Date: November 12, 2020

EFiled: Nov 12 2020 09:47AM
Transaction ID 66103237
Case No. N20C-11-102 MMJ

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,

  Plaintiff,

v.            C.A. No._____

FOX NEWS NETWORK, LLC,
a Delaware Limited Liability Company;
SEAN HANNITY; LAURA INGRAHAM;   **JURY TRIAL DEMANDED**
MARIA BARTIROMO;
HOWARD KURTZ; SHANNON BREAM;
BRET BAIER; TRISH REGAN;
RAYMOND ARROYO; JON SCOTT; and
LELAND VITTERT,

  Defendants.

### NOTICE OF MOTION

  ***PLEASE TAKE NOTICE*** that the within Motion for Appointment of a Special Process

Server to serve the Summons, Complaint and other suit papers on Defendant Fox News Network

will be presented at the convenience of the Court

        SEITZ, VAN OGTROP & GREEN, P.A.

        /s/ R. Karl Hill
        R. KARL HILL (2747)
        222 Delaware Avenue, Suite 1500
        Wilmington, DE 19801
        (302) 888-0600

Date: November 12, 2020

EFiled: Nov 12 2020 09:47AM
Transaction ID 66103237
Case No. N20C-11-102 MMJ

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,

     Plaintiff,

v.                         C.A. No. _____

FOX NEWS NETWORK, LLC,
a Delaware Limited Liability Company;
SEAN HANNITY; LAURA INGRAHAM;    **JURY TRIAL DEMANDED**
MARIA BARTIROMO;
HOWARD KURTZ; SHANNON BREAM;
BRET BAIER; TRISH REGAN;
RAYMOND ARROYO; JON SCOTT; and
LELAND VITTERT,

     Defendants.

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that on this 12th day of November 2020 Plaintiff's Request for

the Production of Documents was served upon Defendant Fox News Network, LLC via hand

delivery to the registered agent as follows:

Fox News Network, LLC
c/o Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

                       SEITZ, VAN OGTROP & GREEN, P.A.

                       /s/ R. Karl Hill
                       R. KARL HILL (2747)
                       222 Delaware Avenue, Suite 1500
                       Wilmington, DE 19801
                       302-888-7604

EFiled: Nov 12 2020 09:47AM
Transaction ID 66103237
Case No. N20C-11-102 MMJ

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,

    Plaintiff,

v.

    C.A. No._____

FOX NEWS NETWORK, LLC,
a Delaware Limited Liability Company;
SEAN HANNITY; LAURA INGRAHAM;
MARIA BARTIROMO;
HOWARD KURTZ; SHANNON BREAM;
BRET BAIER; TRISH REGAN;
RAYMOND ARROYO; JON SCOTT; and
LELAND VITTERT,

    Defendants.

**JURY TRIAL DEMANDED**

## ORDER

This \_\_\_\_\_ day of _____ 2020, Plaintiff, having moved this Court for an

Order pursuant to Superior Court Civil Rule 4 appointing Parcels, Inc. as Special Process Server,

**IT IS SO ORDERED** that Parcels, Inc. is hereby appointed Special Process Server for the

purpose of serving the Summons and Complaint and other related papers upon the Defendants in this

action, *nunc pro tunc* to the date of the filing of the Complaint

_____
J.

EFiled: Nov 12 2020 09:47AM
Transaction ID 66103237
Case No. N20C-11-02 MMJ

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| MICHAEL AVENATTI, | |
| Plaintiff, | |
| v. | C.A. No. _____ |
| FOX NEWS NETWORK, LLC, | |
| a Delaware Limited Liability Company; | |
| SEAN HANNITY; LAURA INGRAHAM; | **JURY TRIAL DEMANDED** |
| MARIA BARTIROMO; | |
| HOWARD KURTZ; SHANNON BREAM; | |
| BRET BAIER; TRISH REGAN; | |
| RAYMOND ARROYO; JON SCOTT; and | |
| LELAND VITTERT, | |
| Defendants. | |

## PRAECIPE

TO: PROTHONOTARY

*PLEASE* issue a Writ of Summons for service of the Complaint on the Defendant as

follows:

> Fox News Network, LLC
> c/o Corporation Trust Company
> 1209 Orange Street
> Wilmington, DE 19801

SEITZ, VAN OGTROP & GREEN, P.A.

/s/ R. Karl Hill
R. KARL HILL (2747)
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
302-888-7604

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHAEL AVENATTI,

     Plaintiff,

v.

FOX NEWS NETWORK, LLC,
a Delaware Limited Liability Company;
SEAN HANNITY; LAURA INGRAHAM;
MARIA BARTIROMO;
HOWARD KURTZ; SHANNON BREAM;
BRET BAIER; TRISH REGAN;
RAYMOND ARROYO; JON SCOTT; and
LELAND VITTERT,

     Defendants.

C.A. No._____

JURY TRIAL DEMANDED

## REQUEST FOR PRODUCTION OF DOCUMENTS

Plaintiff, by and through counsel, pursuant to Superior Court Civil Rules 26 and 34, hereby requests that the following documents be produced.

## DEFINITIONS

1.     "You" or "your" refers to Defendants and, if applicable, its agents, representatives, employees and all other persons acting on its behalf.

2.     "Complaint" means the Complaint filed in this action on November 12, 2020.

3.     The terms "document" and "documents" have the broadest meaning permissible under the Superior Court Civil Rules and shall include any written, printed, typed, spoken, computerized, electronic, digital, or other graphic, phonic or recorded matter of any kind or nature, however produced or reproduced, whether sent or received or neither, including drafts and copies bearing notations or marks not found on the original, including but not limited to:

    (a)    Electronically stored information;

    (b)    All contracts, agreements, representations, warranties, certificates, opinions;

1

(c)     All letters or other forms of correspondence or communication including e-mail, facsimiles, envelopes, notes, telegrams, cables, telex messages, text messages, and messages (including reports, notes, notations, and memoranda of or relating to telephone conversations or conferences);

(d)     All memoranda, reports, plans, specifications, drawings, renderings, financial statements or reports, blueprints, notes, transcripts, tabulations, analyses, evaluations, projections, work papers, corporate records or copies thereof, lists, comparisons, questionnaires, surveys, charts, graphs, summaries, extracts, statistical records, notes, compilations;

(e)     All desk and pocket calendars, appointment books, diaries, logs;

(f)     All books, articles, press releases, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, manuals;

(g)     All transcripts of meetings, including tape recordings and minutes;

(h)     All photographs, microfilm, microfiche, phonographs, tapes or other records, punch cards, magnetic tapes, disks, data cells, drums, printouts, text messages, and any other means of storing or recording information;

(i)     All files from any personal computer, notebook, or laptop computer, file server, minicomputer, mainframe computer, or other storage device, including but not limited to hard disk drives, flash and thumb drives, or backup or archival tapes (whether stored on-site or at an off-site storage facility) and any other form or manifestation of electronically stored and/or retrieved electronic information, including but not limited to e-mail. All relevant files that are still on the storage media, but that are identified as "erased but recoverable" are to be included.

4.      "Identify," "Identity" or "Identification":

(a)     When used in reference to a natural person, the terms "identify," "identity" or "identification" mean provide (i) full name; (ii) present or last known home and business address; (iii) telephone number (iv) present or last known business or employment affiliation; and (v) present or last known business or employment position (including job title and a description of job functions, duties and responsibilities).

(b)     When used in reference to any entity other than a natural person, the terms "identify," "identity" or "identification" mean provide (i) its full legal name; (ii) the address of its principal place of business; and (iii) the identity of all individuals who acted on its behalf in connection with the matters referred to in these interrogatories.

(c)     When used in reference to a document, the terms "identify," "identity" or "identification" mean provide (i) the nature of the document (e.g. letter, contract, memorandum) and any other information (i.e. its title, index or file number) that would facilitate the identification thereof; (ii) its date of preparation; (iii) its present location and the identity (as defined above) of its custodian or, if its present location and custodian are not known, a description of its last known location, and its disposition; (iv) its subject matter and substance; (v) the identity (as defined above) of each person who performed any function or had any role in connection therewith (i.e., author, contributor of information, recipient, etc.) or who has any knowledge thereof together with a description of each such person's function, role or knowledge thereof together with a description of each person's function, role or knowledge; and (vi) if the document has been destroyed or is otherwise no longer in existence or cannot be found, the reason why such document no longer exists, and the identity (as defined above) of the person(s) responsible for the destruction or loss of the document, and the identity of its last custodian.

(d)    When used in connection with an oral communication, the terms "identify," "identity" or "identification" mean provide (i) its general nature (i.e., conference, telephonic communication, etc.); (ii) the time and place of its occurrence; (iii) its subject matter and substance; (iv) the identity (as defined above) of each person who performed any function or had any role in connection therewith or who has any knowledge thereof together with a description of each such person's function, role or knowledge; and (v) the identity (as defined above) of each document that refers thereto or that was used, referred to or prepared in the course of as a result thereof.

5.    "Communication" means the transmittal of information in the form of acts, ideas, inquiries or otherwise, whether by verbal or written statement, dialogue, colloquy, discussion, conversation or otherwise. The term further includes, without limitation, both communications and statements which are face-to-face and those which are transmitted by media such as intercom, telephone, television, radio, computer, or electronic device.

6.    "Person" or "persons" means a natural person, firm, partnership, limited liability company, association, joint venture, corporation, public entity, or any other form of business organization or arrangement.

7.    The term "relating to" means concerning, referring to, describing, evidencing, disclosing, mentioning, advertising or constituting in whole or in part.

8.    The term "including" means including without limitation.

9.    The terms "all" and "each" shall be construed as "all and each."

10.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4

11.     The use of the singular form of any word includes the plural and vice versa. The past tense shall include the present tense and vice versa. The masculine gender includes the feminine and neuter genders and vice versa; the neuter gender includes the masculine and feminine genders.

## INSTRUCTIONS

1.      You must read and interpret these Requests for Production of Documents in accordance with the Instructions and Definitions set forth herein and the applicable rules of procedure.

2.      Each document request seeks production of all documents described along with any attachments, draft or non-identical copies. Each document request seeks production of the documents in their entirety, without abbreviation, expurgation, or redaction.

3.      In responding to these Requests for Production of Documents, furnish all responsive documents that are available to you, including documents in the possession of your representatives, employees, agents, advisors, attorneys or any other person acting on your behalf or otherwise subject to your control.

4.      In responding to these Requests for Production of Documents, make a diligent search of your records, electronic files (including without limitation backup files and electronic archives) and of other papers and materials in your possession or available to your representatives. If you cannot obtain the documents requested, explain in your response the circumstances and what has been and is being done to obtain the documents.

5.      If any documents requested herein have been lost, discarded or destroyed, they shall be identified and described as completely as possible, including, without limitation, the following

information: date of disposal, reasons for disposal, person authorizing the disposal, person disposing of the document and contents of the document.

      6.      Each Request for Production of Documents should be construed independently and is not to be referenced to any other request herein for purposes of limitation, unless one request specifically refers to another request.

      7.      These Requests for Production of Documents are continuing in nature in accordance with Superior Court Civil Rule 26(e). If at any time additional information is learned or acquired or additional documents come into your possession, custody or control, or are brought to your attention, prompt supplementation is required.

      8.      Where a claim of privilege or other protection from discovery is asserted in responding or objecting to Request for Production of Documents and any documents are not provided on the basis of such assertion, you must provide all information required by the Superior Court, including but not limited to Superior Court Civil Rule 26 and Delaware Rule of Evidence 502.

## REQUESTS

      1.      All DOCUMENTS, including but not limited to all research packets, emails, text messages, encrypted messages, and instant messages, relating to, mentioning or referencing Plaintiff Michael Avenatti during the time period February 15, 2018 to the present.

      2.      All DOCUMENTS relating to, concerning, mentioning or referencing Plaintiff Michael Avenatti's November 2018 arrest. Note: This request specifically includes, but is not limited to, all broadcasts of video or audio, as well as all research packets, emails, text messages, encrypted messages, instant messages, reports, statements, complaints and tweets.

3.      All DOCUMENTS referencing or relating in any way to any of the quotes referenced in the Complaint in this lawsuit.  Note:  This request specifically includes, but is not limited to, all scripts (including drafts), research packets, rundowns, packages, transcripts and video and audio footage.

4.      All print articles and web postings, including but not limited to all drafts of such articles and postings prior to publication, relating to or mentioning Plaintiff Michael Avenatti and published by Fox News, any affiliate or any Defendant during the time period February 15, 2018 to the present.

5.      All DOCUMENTS, information and materials obtained during the time period November 13, 2018 to the present regarding or referencing Mr. Avenatti's November 2018 arrest. This request specifically includes, but is not limited to, all broadcasts of video or audio and all print articles or web postings, as well as all research packets, emails, text messages, encrypted messages, instant messages, tweets and reports.

6.      All DOCUMENTS reflecting or relating to any communication that occurred regarding Plaintiff Michael Avenatti's November 2018 arrest.

7.      All DOCUMENTS reflecting or relating to any editorial scrutiny or editorial standards applied to any of the quotes referenced in the Complaint in this lawsuit.

SEITZ, VAN OGTROP & GREEN, P.A.

/s/ R. Karl Hill
R. KARL HILL (2747)
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
302-888-7604

Date:  November 12, 2020